1  **LYNCH CARPENTER LLP**
2  Todd D. Carpenter (CA 234464)
   todd@lcllp.com
3  Scott G. Braden (CA 305051)
   scott@lcllp.com
4  James B. Drimmer (CA 196890)
   jim@lcllp.com
5  1234 Camino Del Mar
   Del Mar, California 92014
6  Telephone:  (619) 762-1900
   Facsimile:  (858) 313-1850
7
   *Attorneys for Plaintiff and*
8  *Proposed Class Counsel*

9              **UNITED STATES DISTRICT COURT**

10            **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 11  JEFFREY JACOBS, on behalf of himself and all others similarly situated, | Case No.: |
| 12 | **CLASS ACTION COMPLAINT** |
|       Plaintiff, | |
| 13 | **Violations of:** |
|       v. | |
| 14 | 1. **California's Unfair Competition Laws ("UCL")** CAL. BUS. & PROF. CODE §§ 17200, *et seq.* |
| 15  LA-Z-BOY INCORPORATED, a Michigan corporation, and DOES 1-50, inclusive, | |
| 16 | |
| 17       Defendants. | 2. **California's False Advertising Laws ("FAL")** CAL. BUS. & PROF. CODE §§ 17500, *et seq.* |
| 18 | |
| 19 | 3. **California's Consumers Legal Remedies Act ("CLRA")** CAL. CIV. CODE § 1750, *et seq.* |
| 20 | |
| 21 | |
| 22 | **[DEMAND FOR JURY TRIAL]** |
| 23 | |

24
25
26
27
28

CLASS ACTION COMPLAINT

Plaintiff Jeffrey Jacobs ("Plaintiff") brings this action, on behalf of himself and all others similarly situated, against Defendant La-Z-Boy Incorporated ("Defendant"), and states:

### IV.  NATURE OF ACTION

1.      "Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society." *Vasquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971). This principle is as true today as it was over 50 years ago when it was penned by Justice Mosk writing for a unanimous California Supreme Court. This putative class action is about holding a multimillion-dollar company accountable to its customers who have been deceived by a years-long campaign to trick them into paying more for Joybird products at joybird.com and Joybird retail showroom stores through the widespread and perpetual use of false reference and discount pricing. "In short, the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin et al., *Competition and the Regulation of Fictitious Pricing*, 87 J. Mktg., 826, 835 (2023).

2.      Prices reflect a perceived value to consumers.[1] False advertising of prices can be used to manipulate consumers' value perception of products and cause consumers to overpay for them. Aware of the intertwined connection between consumers' buying decision processes and price, retailers like Defendant lure consumers with advertised discounts that promise huge savings and high value. But the promised savings are false, and the product's value reflected in its price is

---

[1] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (1992) ("[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price."); Patrick J. Kaufmann et al,, *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. RETAILING 115, 118 (1994) ("[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value").

incorrect when the retailer advertises discounts off of some higher, made-up, and artificially inflated "original" price that no one ever pays.

3.      At all relevant times, Defendant has continually advertised and sold falsely discounted furniture and home décor products through its e-commerce retail channel, joybird.com, and in its Joybird retail showrooms. Defendant "own[s] Joybird, a leading e-commerce retailer and manufacturer of upholstered furniture." La-Z-Boy Inc., Annual Report (Form 10-K), at 12 (Jun. 20, 2023).[2] "Joybird sells product[s] almost exclusively online, where there is significant competition for customer attention among online and direct-to-consumer brands." *Id*. [3] In bringing this putative class action complaint, Plaintiff seeks to remedy this deception and its attendant harm to consumers. Plaintiff seeks monetary damages, restitution, and declaratory and injunctive relief from Defendant arising from its false discounting scheme on furniture and home décor items sold on joybird.com and its limited Joybird retail showrooms.

4.      False reference pricing occurs when a seller fabricates a false "original" price for a product and then offers that product at a substantially lower price under the guise of a discount. The resulting artificial price disparity misleads consumers into believing the product they are buying has a higher market value, and it induces them into purchasing the product. This practice artificially inflates the market price for these products by raising consumers' internal reference price and in turn the perceived value consumers ascribe to these products (i.e., demand).[4] Consequently,

---

[2]      https://www.sec.gov/Archives/edgar/data/57131/000005713123000032/lzb-20230429.htm

[3] Defendant's most recent 2023 Form 10-K goes on to explain. "[w]e manufacture, **market**, import, export, distribute and retail upholstery furniture products under the … **Joybird® tradename**[] [and] … import, distribute and **retail** accessories and casegoods (wood) furniture products under the … Joybird® tradename[]." La-Z-Boy Inc., Annual Report (Form 10-K), at 4, 21 (Jun. 20, 2023) (emphasis added).

[4] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").

false reference pricing schemes enable retailers, like Defendant, to sell products above their true market price and value, leaving consumers to pay the inflated price regardless of what they thought of the purported discount. Consumers are thus damaged not only by not receiving the promised discount, but by paying a premium the products would not have commanded but for the false reference pricing scheme.

5.    The following example of a hypothetical DVD seller, which parallels Defendant's practice, illustrates how false reference pricing schemes harm consumers: the DVD seller knows it can sell a particular DVD at $5.00, which represents both the market price and the price at which the seller could regularly offer the DVD and make a profit. Instead, however, the seller creates a fake "original" price for the DVD of $100.00 and advertises the DVD as "on sale" at 90% off, creating a (fake) "sale" price of $10.00. Consumers purchasing the DVD for $10.00 assume they got a "good deal" since the DVD was previously sold—i.e., valued by others in the market—at an "original" price of $100.00, and presumably would be again soon.

6.    The consumer's presumption and purchase stem directly from the seller's deception. For example, if the seller tried to sell that same DVD for $10.00 **without** referencing a false original price of $100.00, and the attendant 90% off discount, that seller would not be able to sell many, if any, DVDs at $10.00 because the true market value of the DVD is $5.00. In contrast, by presenting consumers with a false "original" price of $100.00, consumers *will* purchase the DVD at $10.00. By doing so, the seller has fabricated an artificial and illegitimate increase in consumer demand for the DVD through the reasonable, but incorrect, **perceived value** of the DVD in connection with the substantial discount of $90.00. The net effect of myriad consumers' increased willingness to pay $10.00 for the DVD, based on the false discount, in turn creates a new, albeit artificial and illegitimate, market price of the DVD. The seller can therefore create an artificially inflated market price for the

DVD of $10.00 by advertising the false "original" price and corresponding fake discount.

7. Through its false and misleading marketing, advertising, and pricing scheme alleged herein, Defendant violated, and continues to violate, California and federal law. Specifically, Defendant violated and continues to violate: California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* (the "UCL"); California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* (the "FAL"); California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq* (the "CLRA").; and the Federal Trade Commission ("FTC") Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

8. Plaintiff brings this action on behalf of himself and other similarly situated consumers who have purchased one or more of Defendant's Joybird items advertised at a purported discount from a fictitious higher reference price from joybird.com and through Joybird retail showroom stores in California. Plaintiff intends to halt the dissemination and perpetuation of this false, misleading, and deceptive pricing scheme, to correct the false and harmful perception it has created in the minds of consumers, and to obtain redress for those who overpaid for merchandise tainted by this deceptive pricing scheme. Plaintiff also seeks to permanently enjoin Defendant from engaging in this unlawful conduct. Further, Plaintiff seeks to obtain all applicable damages, including actual, benefit of the bargain, statutory, and punitive damages, restitution, reasonable costs and attorney's fees, and other appropriate relief in the amount by which Defendant was unjustly enriched as a result of its sales of merchandise offered a false discount.

## V.    JURISDICTION AND VENUE

9. This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000

and Plaintiff, and at least some members of the proposed Class (defined below), have a different state citizenship from Defendant.

10.    The Central District of California has personal jurisdiction over Defendant because Defendant is a corporation or other business entity which does conduct business in the State of California, has sufficient minimum contacts in California, and otherwise intentionally avails itself to the California market through the operation of the joybird.com a and Joybird retail showroom stores within the State of California.

11.    Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendant transacts substantial business in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and Defendant's misconduct alleged herein occurred in this District.

## VI.    GENERAL ALLEGATIONS

### A.    Retailers Benefit from False Reference Pricing Schemes.

12.    Defendant engages in a false and misleading reference price scheme in the marketing and selling of its Joybird furniture and home décor products on joybird.com and through Joybird retail showroom stores.

13.    As mentioned above, retailers like Defendant can benefit substantially from false discounting schemes because "framing a price increase as a discount can not only allow the firm to get *higher margins*, but also *increase sales*." Staelin et al., *supra*, at 835 (emphasis added). This is because consumers use advertised reference prices to make purchase decisions, particularly when the information available to consumers can vary among different types of products.[5] Most often, as

_____

[5] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (e.g., style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (e.g., longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (e.g., whether the shirt's cotton was produced using organic farming methods). Michael R. Darby, & Edi Karni. *Free*

with retail clothing, consumers lack full information about the products and, as a result, often use information from sellers to make purchase decisions.[6]

14.  Defendant's deceptive advertised reference prices are thus incorporated into consumers' decision process. First, a product's "price is also used as an indicator of product quality."[7] In other words, consumers view Defendant's deceptive advertised reference prices as a proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[8] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[9] Under this concept, coined as "transaction utility" by Nobel Prize-winning economist Richard Thaler, consumers place value on the psychological experience of obtaining a product at a perceived bargain.[10]

---

*Competition and the Optimal Amount of Fraud*, J. LAW & ECONOMICS 16 no. 1 (1973): 67-88, at 68-69.

[6] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Phillip Nelson. *Information and Consumer Behavior*. J. POLITICAL ECONOMY 78, no. 2 (1970): 311-29, at 311-12.

[7] Dhruv Grewal & Larry D. Compeau. *Comparative Price Advertising: Informative or Deceptive?*, J.PUBLIC POLICY & MARKETING (1992): 52-62, at 54;  *see also* Richard Thaler. *Mental Accounting and Consumer Choice*. MARKETING SCIENCE 4, no. 3 (1985): 199-214, p. 212 ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

[8] Dhruv Grewal, & Larry D. Compeau. *Comparative Price Advertising: Informative or Deceptive?*, J. OF PUBLIC POLICY & MARKETING (1992): 52-62, at 52.

[9] Peter Darke & Darren Dahl. *Fairness and Discounts: The Subjective Value of a Bargain*. J. OF CONSUMER PSYCHOLOGY 13, no 3 (2003): 328-38, at 328.

[10] "To incorporate … the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal.'" Richard Thaler. *Mental Accounting and Consumer Choice*. MKTG SCI. 4, no. 3 (1985): 199-214, at 205; *The Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel 2017*, THE NOBEL PRIZE (Oct. 9, 2017),    https://www.nobelprize.org/prizes/economic-sciences/2017/press-release/

---

7

15.     Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[11] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment" (e.g., a "suggested retail price," or other comparative sale price).[12] Researchers report that consumer's internal reference prices adjust toward external reference prices when valuing a product.[13] For infrequently purchased products, external reference prices can be particularly influential because these consumers have little or no prior internal reference.[14] In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher for buyers with less experience or knowledge of the product and product category."[15] Academic literature further

---

("Richard Thaler's contributions have built a bridge between the economic and psychological analyses of individual decision-making.").

[11] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Glenn E. Mayhew & Russell S. Winer. *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*, J. OF CONSUMER RESEARCH 19, no. 1 (1992): 62-70, at 68.

[12] Glenn E. Mayhew & Russell S. Winer. *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*. J. CONSUMER RESEARCH 19, no. 1 (1992): 62-70, at 62.

[13] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Dhruv Grewal, Kent B. Monroe & Ramayya Krishnan. *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions*. J. OF MARKETING 62 (1998): 46-59, at 48.

[14] As Thalen notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Richard Thaler. *Mental Accounting and Consumer Choice*. MKTG SCI. 4, no. 3 (1985): 199-214, at 212.

[15] Dhruv Grewal & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue*. J. PUBLIC POLICY & MARKETING 18, no. 1 (1999): 3-10, at 7.

reports that "there is ample evidence that consumers use reference prices in making brand choices"[16] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][17]

16.     In *Regulation of Fictitious Pricing*, published last year, authors Richard Staelin, a Duke marketing professor since 1982, Joel Urbany, a Notre Dame marketing professor since 1999, and Donald Ngwe, a senior principal economist for Microsoft and former marketing professor for Harvard, built on their prior analytic work to explain the effects of false reference pricing schemes and why their use has not dissipated as previously expected by the FTC, but rather have become more prevalent in the absence of FTC regulation. Importantly, this new study cites and confirms many of the same older consumer studies cited above[18] and notes that the findings of these "older" studies are still widely accepted relevant principles in the economic discipline. *See id.*

17.     Additionally, Staelin, in *Regulation of Fictitious Pricing*, explains how the modern development of consumer search behavior and options available to

---

[16] Gurumurthy Kalvanaram & Russell S. Winer. *Empirical Generalizations from Reference Price Research*. MARKETING SCIENCE 14, no. 3 (1995): G161-G169, at G161; *see also* Jerry B. Gotlieb & Cyndy Thomas Fitzgerald. *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*. J. OF APPLIED BUS. RESEARCH 6, no. 1 (1990): 59-69, at 65-66. ("The results of this research provide support for the position that [external] reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product.").

[17] Dhruv Grewal & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue*. J. PUBLIC POLICY & MARKETING 18, no. 1 (1999): 3-10, at 7.

[18] *See* Staelin, *Regulation of Fictitious Pricing* (manuscript at 3) ("It is now well established that many consumers get extra utility beyond that associated with consuming the product from purchasing it on deal (Thaler 1985, Compeau & Grewal 1998, Krishna et al. 2002) and that magnitude of this utility is a function of the size of the deal.").

consumers (e.g., smartphones, online shopping) has actually *spread* the presence of fictitious reference pricing, not extinguished it.[19] According to Staelin and his co-authors "disclosure of the true normal price charged may be the only solution that could plausibly influence both consumer and firm behavior." *Id.* at 826; *see also id.* at 831 ("Identical firms, selling identical products, make positive profits because of their obfuscation strategy, and the likelihood of obfuscation grows as competition intensifies.").

18.     Consequently, retailers like Defendant, who understand that consumers are susceptible to a bargain, have a substantial financial interest in making consumers think they *are* getting a bargain, even when they are not. Contrary to the illusory bargains in Defendant's advertisements, consumers are not receiving *any* discount and are actually *overpaying* for Defendant's product because, as Staelin *et al.* put it, "[t]he magnitude of both real and fake discount[s] were significant predictors of demand above the effects of the actual sales price, ***with fake discounts having a substantially larger effect than real discounts***." *Id.* at 835 (emphasis added).

**B.     Defendant Engages in a Fraudulent Price Discounting Scheme.**

19.     Defendant engages in a fake discounting scheme that harms consumers by advertising upholstered furniture goods and related products on joybird.com and in its retail showrooms with false "original" and discounted "sale" prices. For instance, its listing pages[20] depict rows of items including a photo of the item above a struck-through original price in black font next to a "sale" price in red font (e.g., ~~$2,629~~ $1,840). The individual product pages include the same "original" price in black font with a strikethrough on it next to a "sale" price in red. However, the product page also includes a "Save $__" amount in red font next to the phony "sale"

---

[19] Staelin et al., *supra*, at 826. (explaining how the study "develop(s) a descriptive model explaining why fictitious reference pricing has spread instead of being extinguished by competition.").
[20] *See, e.g.*, https://joybird.com/bedroom/

price, which represents the difference between the false reference and sale prices. E.g., (Save $789). The appearance of the "Save $___" amount and "sale" price in red font communicates the urgency with which consumers need to act if they wish to take advantage of the "savings." In truth, however, the false reference prices advertised at joybird.com operate as a baseline for consumers to rely on to assess a product's value. Showing the purported discount in red alongside this "original" price communicates to consumers that the product is being offered at a substantial discount from a former price and will return to that price if the shopper fails to act. The photo(s) below illustrate this practice, which is uniform across joybird.com.[21]



---

[21] Attached hereto as Exhibit A are numerous snapshots from joybird.com depicting falsely discounted merchandise. Attached as Exhibit B are numerous snapshots of the website acquired from the Wayback Machine ("WBM"). WBM (accessible at https://wayback-api.archive.org/) is a well-regarded internet archive of websites and webpages as they existed at one point in time. In other words, while a website may update its content periodically, WBM permits users to view it exactly as it appears on the date the page snapshot is taken. The date of the snapshot is shown at the top-right corner of each page.

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CLASS ACTION COMPLAINT



20.    The Joybird furniture and home décor products sold through Defendant's Joybird retail showrooms are advertised with the same false reference and sales prices as are advertised on joybird.com. The floor models displayed in the showrooms are advertised with signs bearing the reference price which are then "discounted" by "___% Off" signs inside the store. Thus, Defendant's marketing of false reference and sale prices in its brick-and-mortar showrooms is consistent with its online practice. Additionally, the Joybird furniture and home décor products sold

through the retail showrooms are the same products as those offered on joybird.com. As in Plaintiff's case, discussed below, items purchased in the showrooms are shipped to customers from the same US distribution facility(ies) as products ordered directly by customers at joybird.com. On information and belief, the only difference is that one of Defendant's employees assists with making the order for purchases made via showroom. Thus, the false discounting scheme used by Defendant on joybird.com and in its California retail showrooms is uniform and identical.

21.     Further, both channels consist of *exclusive* products that are not sold in La-Z-Boy or other furniture stores.[22] According to Defendant's 2023 10-K, "Joybird sells product almost exclusively online, where there is significant competition for customer attention among online and direct-to-consumer brands." La-Z-Boy Inc., Annual Report (Form 10-K), at 12 (Jun. 20, 2023). The only remaining market are the "limited" "proprietary retail showroom floor space including ten small-format stores in key urban markets." *Id.* at 5, 22. The showrooms advertise perpetual

---

[22] *See Sperling v. Stein Mart, Inc.*, 291 F. Supp. 3d 1076, 1084 (C.D. Cal. 2018) ("In exclusive product cases, a store, often an outlet store, sells a lower-price, different version of a product sold in a traditional retail store. The outlet uses the price of the product made for the retail store as a comparative reference price on price tags. However, the actual product being sold in the outlet is made exclusively for the outlet and is never sold for the comparative reference price at a traditional retail store. In those cases, courts generally find that a plaintiff can proceed with his or her claims."); *Branca v. Nordstrom, Inc.*, No. 14cv2062-MMA, 2015 WL 10436858, at *7–8 (S.D. Cal. Oct. 9, 2015) (denying a motion to dismiss where the plaintiff alleged that items at Nordstrom Rack were compared to full-price products sold at Nordstrom retailers and that "the items were never sold elsewhere for any other price besides the Nordstrom Rack retail price"); *Stathakos v. Columbia Sportswear Co.*, No. 15-cv-04543-YGR, 2017 WL 1957063, at *8 (N.D. Cal. May 11, 2017) (denying a motion for summary judgment in part where the plaintiffs asserted evidence that the defendant sold products exclusively made for its outlet stores but compared their prices to products sold in full retail stores); *Rubenstein v. Neiman Marcus Grp. LLC*, 687 F.App'x 564, 567 (9th Cir. 2017) (reversing dismissal where the plaintiff alleged that Neiman Marcus Last Call used reference prices to products sold at Neiman Marcus retail stores even though the products were made exclusively for Neiman Marcus Last Call). Even assuming *arguendo* that other markets exist, this point is immaterial because Plaintiff has pled a violation of the FTCA, which is retailer-specific in proscribing false former prices, and the Ninth Circuit has unequivocally held the FTCA may serve as a predicate violation for a UCL claim. *Rubenstein*, 687 F.App'x at 567 ("allegations of a [FTCA guideline] violation … are sufficient to state a claim under the UCL.").

discounts in multiple locations throughout the store, including near floor models (e.g., "40% Off", "up to 50% off entire store").

22.     Thus, Defendant is not offering a "discount" from their own or any competitor's retail prices because the Joybird products are not sold in any other relevant market (or *any* market).[23] Accordingly, there is no regular or market price for the Joybird products offered for sale at joybird.com or its retail showrooms other than the price set by Defendant in those retail channels. But both joybird.com and its retail showrooms rarely, if ever, offer or sell the products at the "original" prices. Those prices are used solely as a benchmark to induce consumers to make purchases and spend more under the reasonable, but incorrect, belief that the merchandise was once sold at the reference price when, in reality, the products remain forever "discounted."

23.     Even if Defendant did occasionally offer its Joybird furniture and home décor products at their full reference price (which it does not), that offering would do little to legitimize Defendant's practice. This is because, for the advertised former price to be "actual, bona fide" and "legitimate" it must be the "price at which the

---

[23] Moreover, this case does not involve "Compare At" pricing representations, in which a defendant could plausibly assert that its advertised reference prices did not represent former prices but those of competitors. *See, e.g., Branca*, No. 14CV2062-MMA (JMA),2015 WL 10436858, at *1. Here, Defendant's exclusive products all bear the same strike-through font discount method indicating a former price. Based on this pricing model, consumers have no reason to suspect that the stricken prices are anything but Defendant's former prices, not a comparison to a competitor's prices or even other La-Z-Boy furniture products. Thus, they have no motivation to look elsewhere. *See Marino v. Coach, Inc.*, 264 F. Supp. 3d 558, 570 (S.D.N.Y. 2017) ("The Court also finds that Marino has plausibly alleged that the [Manufacturer's Suggested Retail Price or] MFSRPs are misleading. [Coach argued] a reasonable consumer could not be misled into believing the MFSRPs are former prices. In support of this argument, Coach notes that disclaimers in its stores explain that MFSRPs are intended to be indicators of 'Value.' Whether, in the face of such disclaimers, a reasonable consumer could nonetheless believe that the MFSRPs are former prices is an issue of fact to be resolved at a later stage of this litigation."); *Vizcarra v. Michaels Stores, Inc.*, No. 23-cv-00468-PCP, __ F. Supp. 3d __, 2024 WL 64747, at *4 (N.D. Cal. Jan. 5, 2024) ("A reasonable consumer does not need language such as, 'Formerly $9.99, Now 40% Off $9.99,' or '40% Off the Former Price of $9.99,' to reasonably understand '40% off' to mean 40% off the former price of the product.") (quoting *Knapp v. Art.com, Inc.*, No. 16-CV-00768-WHO, 2016 WL 3268995, at *4 (N.D. Cal. June 15, 2016)).

CLASS ACTION COMPLAINT

article was offered to the public **on a regular basis for a reasonably substantial period of time**." 16 C.F.R. § 233.1(a) (emphasis added). Nor would such rare offerings constitute the "prevailing market price" within the "three months next immediately preceding the publication of the advertisement," as is required by the FAL, Cal. Bus. & Prof. Code § 17501, "unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement[,]" which Defendant also fails to do on *all* advertisements. Rather, the advertised reference prices on Joybird products are *not* the price at which Defendant regularly (or ever) sells, or expects to regularly sell, the products; they are merely a basis for misleading consumers into believing they are receiving a substantial discount.

24.     In sum, Defendant's fake discount scheme is intended to increase sales while depriving consumers of the benefit of their bargain.[24] Indeed, this conduct deprives consumers of a fair opportunity to fully evaluate the offers and to make purchase decisions based on accurate information. Nowhere on joybird.com or in its retail showrooms does Defendant disclose that the "original" reference prices are **not**: (1) actual, bona fide former prices; (2) recent, regularly offered former prices; or (3) prices at which identical products are regularly sold elsewhere in the market. Nor does Defendant disclose any date on which the "original" prices last prevailed in the market. The omission of these material disclosures, coupled with Defendant's use of fake reference and sale prices, renders Defendant's Joybird pricing scheme inherently misleading to reasonable consumers, like Plaintiff,[25] who have no way meaningful

---

[24] Staelin *et al.*, *supra*, at 826 ("It is now well accepted that many consumers get extra utility, beyond that associated with consuming a product, from purchasing it on deal [] and that the magnitude of this utility is a function of the size of the deal.").

[25] Claims brought pursuant to the CLRA, UCL, and FAL are all "governed by the 'reasonable consumer' test." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). "Where, as here, the reasonable consumer test applies to plaintiff's underlying [false discount pricing] claims, it is a 'rare situation in which granting a motion to dismiss is appropriate.'" *Rubenstein*, 687 F.App'x. at 566 (citing *Williams*, 552 F.3d at 939). Numerous courts analyzing allegations of false discount pricing have likewise held that the "reasonable consumer" challenges are inappropriate on the pleadings. *See, e.g., Inga v. Bellacor.com, Inc.*, No. 219CV10406MWFMRW,

way of discerning that Defendant's pricing representations are deceptive without substantial, time-consuming, and costly investigation before *every* purchase.

### C. Defendant's Fraudulent Price Discounting Scheme Harms All Consumers.

25.     A product's reference price matters because it serves as a baseline upon which consumers perceive its value.[26] Empirical studies "suggest that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[27] Consumers are misled and incorrectly overvalue Defendant's Joybird furniture products as a result of the false price comparisons. The products' actual sales prices, therefore, reflect consumers' overvaluation of them, which in turn permits Defendant to command inflated prices for them beyond what the market would otherwise allow. As discussed above, academic researchers have documented the relationship between reference prices and consumer behavior, as well as the resulting harm from *false* reference prices:

> [A]dvertised reference prices in these deal-oriented advertisements can enhance buyers' internal reference prices . . . . These enhanced internal reference prices, when compared with the lower selling price, result in higher transaction value perceptions. The increase in perceived transaction value enhances purchases and reduces search behavior for lower prices. If sellers intentionally increase the advertised reference prices above normal retail prices, this is, inflate advertised reference prices, the resulting inflated perceptions of transaction value would be deceptive. Harm to both buyers and competitors could result from the

---

2020 WL 5769080, at *3 (C.D. Cal. July 17, 2020) (citing *Williams*, 552 F.3d at 939); *Chester v. TJX Companies, Inc.*, No. 515CV01437ODWDTB, 2016 WL 4414768, at *10 (C.D. Cal. Aug. 18, 2016); *Horosny v. Burlington Coat Factory of CA, LLC*, No. 15-cv-5005, 2015 WL 12532178, at *4 (C.D. Cal. Oct. 26, 2015).

[26] Richard Thaler, *Mental Accounting and Consumer Choice*, MKTG SCIENCE 4, no. 3 (1985): 199-214, at 212.

[27] Jerry B. Gotlieb & Cyndy T. Fitzgerald. *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*. J. OF APPLIED BUS. RESEARCH 6, no. 1 (1990): 59-69, at 66. Moreover, "if a higher reference price encourages consumers to pay a higher price for a product than the consumer was willing to pay for the identical product with a lower reference price, then the practice of using high reference prices would be deceptive." *Id*. at 60.

effect of the inflated transaction value on buyers' search and purchase behaviors.[28]

26.     Accordingly, all consumers who purchase Joybird products are harmed by Defendant's pricing scheme because its impact pervades the entire market for Joybird merchandise. This is because, again, the artificially increased demand generated by Defendant's pricing scheme results in increased actual sales prices beyond what the products would command in the absence of the false reference pricing scheme. Again, "the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin *et al*., *supra*, at 835. Thus, all Joybird shoppers pay more regardless of their individual beliefs or purchasing decision processes. In other words, their subjective beliefs about the value of the products or the legitimacy of the purported discounts are inconsequential to the injury they incur when purchasing Defendant's Joybird merchandise. All consumers who purchase falsely discounted Joybird products have overpaid and are deprived of the benefit of the bargain (i.e., the promised discount). Additionally, they will have paid a premium for merchandise that is worth less than its actual sales price.

27.     To put it differently, the fake discount information presented by Defendant's false advertised reference and sale prices first causes consumers to (reasonably) perceive they are receiving a bargain when the merchandise is purchased at its "sale" price. This consumer perception results in these consumers gaining an additional "transaction value"[29] on their outlet purchases, which they

---

[28]Dhruv Grewal et al, *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions*, J. OF MKTG 62 (1998): 46-59, at 46.

[29] Thaler, Richard. *Mental Accounting and Consumer Choice*. MKTG SCI. 4, no. 3 (1985): 199-214, at 205 ("To incorporate … the psychology of buying into the model, two kinds of utility are postulated: acquisition utility and transaction utility. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal'."); Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and

would not have otherwise gained but for Defendant's fake discounting scheme. Consumers' valuation of Joybird merchandise therefore increases in the aggregate.

28.     Fundamental economics concepts and principles dictate that the harm caused by Defendant's scheme is uniformly suffered by deceived and, to the extent there are any, non-deceived shoppers alike. One such principle is that cost and demand conditions determine the market prices paid by all consumers.[30] The aggregate demand curve for a product, including Defendant's, represents consumers' valuation of that product as whole; as consumers' valuation increases, the demand curve shifts outward. When the aggregate demand curve of a product shifts outward, its market price will increase. Therefore, a specific individual's willingness to pay a certain price for a product will not negate how market prices, as determined by aggregate demand, dictate what all consumers purchasing a given product will pay.

29.     As a result, Defendant's pricing scheme impacts the market prices for Joybird furniture, and any one individual consumer's subjective beliefs or idiosyncratic rationales will not isolate them from the resultant artificial and illegitimate inflation in Joybird furniture prices. Economic theory ensures that as the aggregate demand curve for the products moves outward, all consumers are forced to pay a higher price than the products would command absent the fake discounting scheme. Plaintiff and proposed Class members thus suffered a common impact from Defendant's misconduct.

---

willingness to buy the product."); Dhruv Grewal, & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue*. J. PUB. POL'Y & MKTG 18, no. 1 (1999): 3-10, at 7.

[30]  Mankiw, N. *Essentials of Economics.* 8th Edition. Boston, MA: Cengage Learning, 2015, at 66 ("[P]rice and quantity are determined by all buyers and sellers as they interact in the marketplace"); *see also* Hal R. Varian, *Microeconomics Analysis.* 3rd Edition. New York, NY: W. W. Norton & Company, 1992, at 23-38, 144-57, 233-353 & 285-312.

**D.    Investigation**

30.    Products sold on Defendant's e-commerce website, joybird.com, and in its retail showrooms are priced uniformly. In other words, the products sold by Defendant bear a substantially discounted sale price that appears next to the "crossed out" or "strikethrough" original price. Plaintiff's counsel tracked numerous items offered for sale on joybird.com from February 2024 through the present. A sample of the items tracked is attached as Exhibit C.[31] The investigation

---

[31] It is noteworthy that, applying California law, numerous false discount pricing cases hold that plaintiffs are *not* required to perform or provide *any* specific details of pre-suit investigations in false discount pricing cases. *See, e.g., Rubenstein*, 687 F.App'x at 568 ("Without an opportunity to conduct any discovery, Rubenstein cannot reasonably be expected to have detailed personal knowledge of Neiman Marcus's internal pricing policies or procedures for its Last Call stores. Because Rubenstein need not specifically plead facts to which she cannot 'reasonably be expected to have access,' her allegations regarding the fictitious nature of the Compared To prices may properly be based on personal information and belief at this stage of the litigation."); *Stathakos*, 2016 WL 1730001, at *3–4 (finding that the plaintiffs' complaint satisfied Rule 9(b) even though the plaintiffs had not plead a pre-suit investigation) (citation omitted); *Knapp*, 2016 WL 3268995, at *4 (finding that the plaintiff's allegations of a "perpetual sale" were alone sufficient); *Horosny*, 2015 WL 12532178, at *4 (denying a motion to dismiss where the plaintiff pled a deceptive pricing scheme "on information and belief" and not based on a pre-suit investigation); *see also Branca*, 2015 WL 10436858, at *7 (finding the plaintiff adequately alleged "why the 'Compare At' prices are false as former prices— because they necessarily cannot be former prices or prevailing market prices, as the items were never sold elsewhere for any other price besides the Nordstrom Rack retail price"); *see also Le v. Kohls Dept. Stores, Inc.*, 160 F. Supp. 3d 1096, 1099 (E.D. Wis. Feb. 8, 2016) (denying a motion to dismiss where the plaintiff had not conducted a nationwide pre-suit investigation before alleging the defendant's comparison prices did not reflect a price at which its merchandise was routinely sold). Put simply, arguments attacking the sufficiency of Plaintiff's counsel's pre-suit investigation allegations at the pleading stage under the auspices of Rule 9(b) are, in actuality, premature challenges to Plaintiff's *factual allegations*, which must be accepted as true at the pleadings stage. Such attempts should be rejected as such a requirement would "raise the pleading standard of Rule 9(b) to unprecedented heights." *See Jacobo v. Ross Stores, Inc.*, No. CV-15-04701-MWF-AGR, 2016 WL 3483206, at *3 (C.D. Cal. June 17, 2016) ("But no authority requires [p]laintiffs to include that information in the pleadings; arguably that level of evidentiary detail would be improper, even under Rule 9(b).").

Even still, complaints containing similar pre-suit investigation allegations, like Plaintiff's here, have routinely been sustained at the pleading stage. *See, e.g., Adams v. Cole Haan, LLC*, No. 8:20-CV-00913-JWH-DFMx, 2021 WL 4907248 (C.D. Cal. Mar. 1, 2021); *Dahlin v. Under Armour, Inc.*, No. CV 20-3706 PA (JEMx), 2020 WL 6647733 (C.D. Cal. July 31, 2020); *Inga*, 2020 WL 5769080, at *1; *Harris v. PFI W. Stores, Inc.*, No. SACV 19-2521 JVS (ADSx), 2020 WL 3965022, at *1 (C.D. Cal. Apr. 9, 2020); *Calderon v. Kate Spade & Co., LLC*,

included daily or near-daily monitoring of these items. In short, the investigation showed that the products were perpetually discounted and remained "on sale" for virtually the entire tracking period. Thus, the investigation confirmed that Defendant's Joybird merchandise is priced with phantom reference prices the vast majority of the time.

31.     The investigation also showed that the pricing scheme (i.e., the manner in which the reference prices and purported discounted were conveyed to shoppers) was uniform and identical across all products monitored or otherwise observed on the website. The only change was the requisite reference price and "discount" on certain products. Thus, the scheme was uniform across Defendant's e-commerce website.

32.     Plaintiff's counsel also researched Defendant's e-commerce website through the WBM. The website snapshots recorded by the WBM are consistent with Plaintiff's counsel's investigation. *See* Exhibit B. This provided further confirmation that Joybird products are, and have been, perpetually advertised with false reference prices.

33.     Indeed, the investigation indicated that Joybird merchandise is never offered for sale at its full "original" price for more than one or two days at a time—and certainly are not "on a regular basis for a reasonably substantial period of time," as required by 16 C.F.R. § 233.1, nor for sufficient time that the reference price *ever* constitutes the *prevailing* market price for the three months preceding publication of the advertised reference prices and discounts.

---

No. 3:19-CV-00674-AJB-JLB, 2020 WL 1062930 (S.D. Cal. Mar. 5, 2020); *Fisher v. Eddie Bauer LLC*, No. 19-cv-857 JM (WVG) 2020 WL 4218228 (S.D. Cal. Feb. 3, 2020); *Dennis v. Ralph Lauren Corp.*, No. 16-cv-1056-WQH-BGS, 2017 WL 3732103 (S.D. Cal. Aug. 29, 2017); *Rael v. New York & Co., Inc.*, No. 16-CV-369-BAS (JMA), 2017 WL 3021019 (S.D. Cal. July 17, 2017); *Azimpour v. Sears, et al.*, No. 15-CV-2798 JLS (WVG), 2017 WL 1496255 (S.D. Cal. Apr. 26, 2017); *Fallenstein v. PVH Corp., et al.*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint).

34.     Thus, Defendant's fraudulent price scheme alleged herein applies to all products offered for sale through joybird.com, including the product purchased by Plaintiff.

35.     However, despite Plaintiff's counsel's best efforts at investigation, the full extent of Defendant's false and deceptive pricing scheme can only be revealed through a full examination of records exclusively in Defendant's possession.

## VII.   PARTIES

**Plaintiff Jeffrey Jacobs**

36.     Plaintiff Jeffrey Jacobs resides in Redondo Beach, California. On January 23, 2023, Plaintiff went shopping for some new furniture at the Joybird showroom located at 8335 Melrose Avenue, Los Angeles, CA 90069. In reliance on Defendant's false and deceptive advertising, marketing and discount pricing scheme promoted at the showroom and online, Plaintiff purchased the following item from Defendant on January 23, 2023:

| No. of Units | Item: | False Reference Price: | Purchase Price: |
|---|---|---|---|
| 1 | 5-piece Bryant U-Sofa Bumper Section (5 piece) | $6,370; 40% Off | $3,822 |
| 2 | Holt Armless Chairs | $3,082; 40% Off (total both units) | $1,850 (total both units) |

37.     During his time at the Joybird showroom store on January 23, 2023, Plaintiff browsed multiple pieces of furniture before deciding on what to purchase. Upon entering the showroom, Plaintiff noticed floor model furniture setups in the front of the store and approximately three large walls containing numerous color and material swatches. These swatches were intended to provide customers with samples of the different colors and materials that the floor models were available in. After browsing for a period of time, Plaintiff purchased the above-listed items, which were advertised with signs displaying their "original" prices, which were each

accompanied by "40% Off" signs. After reviewing the advertised reference and sales prices, Plaintiff decided to purchase the items. Plaintiff paid at the in-store point of sale and, on information and belief, his items were then shipped from one of Defendant's US distribution facilities, the same facility that fills direct-to-consumer orders made on joybird.com. His order number was J494087 and his email invoice is included as Exhibit D.

38.     Indeed, after observing the original prices of the item and the accompanying sale price, Plaintiff believed he was receiving a significant discount on the items he had chosen. His belief that the discounted prices on the items was limited and would not last was material and integral to his purchase decision. He would not have made the purchase were it not for the significant bargain he thought he was receiving. On all products, the advertised discounts were a material representation to him, and he relied on them in making his purchase decision. As shown in Exhibit D, the total "original" price for all three items was $9,452, the purported discount was $3,780, sales tax was $567.20, and shipping costs were $129. Plaintiff paid a total of $6,368.20. However, Plaintiff did not receive the benefit of his bargain.

39.     The merchandise Plaintiff purchased was not, and is not, offered for sale in any other market. Plaintiff is informed and believes and thereon alleges that, in addition to being marketed with a fake discount, the furniture items that were shipped to him differed materially in terms of quality of workmanship and materials as compared to the "same" products he observed at the showroom—the products he thought he was buying. Plaintiff will seek to amend these "bait and switch" allegations upon receipt of documents or testimony during discovery indicating that the products he received were constructed with materially inferior materials and/or workmanship than those on display at the Defendant's Joybird retail showroom(s).

40.     Plaintiff has therefore suffered economic injury as a direct result of Defendant's unlawful, unfair, and fraudulent false reference pricing and bait and switch schemes detailed above.

**Plaintiff's Monetary Injury**

41.     Plaintiff incurred quantifiable monetary injury as a result of Defendant's fraudulent pricing scheme, which can be calculated through the use of, *inter alia*, regression analysis.

42.     Plaintiff overpaid for the products he purchased as described herein. And it was Defendant's false reference pricing scheme and attendant deception that caused Plaintiff to overpay. Despite Plaintiff's original belief that each product he purchased was discounted and thus that its value was significantly greater than the sale price for which he purchased it, Plaintiff, in actuality, paid an *inflated* price for the products he purchased.

43.     That is, the items Plaintiff purchased were all worth less than the amount Plaintiff paid for each of them. If Defendant had not employed the falsely advertised "original" prices for the two items Plaintiff purchased, then those items would not have commanded such high, inflated prices.

44.     Objective measures therefore demonstrate that Plaintiff overpaid for the Joybird furniture he purchased. The difference between the sale price paid by Plaintiff due to the artificially increased demand for the products—caused by Defendant's false reference pricing scheme—and the market sale price that the products would have commanded without Defendant's deception provides an objective measure by which Plaintiff was overcharged and injured by Defendant. The amount of inflation of the prices for the Defendant's Joybird furniture products Plaintiff purchased caused by Defendant's deception thus measures how much Plaintiff overpaid. This amount can be quantified using, *inter alia*, regression analysis based on Defendant's historic pricing data, which Plaintiff will seek through discovery.

1

**Plaintiff Does _Not_ Have An Adequate Remedy at Law**

2       45.    Plaintiff does not have an adequate remedy at law, and is susceptible to

3 this recurring harm because he cannot be certain that Defendant will have corrected

4 this deceptive pricing scheme, and he desires to shop for additional Joybird furniture

5 at either joybird.com or through Defendant's retail showrooms in the future because

6 he likes the style of the furniture. Due to the enormous variety of furniture and

7 related products sold on joybird.com and through its retail showrooms, Plaintiff will

8 be unable to parse what prices are inflated and untrue, and what prices are not.

9 Likewise, without injunctive relief Plaintiff is unable to know, if he were to make a

10 subsequent purchase at a Joybird showroom, whether Defendant will ship him

11 furniture of the same material, quality, and workmanship as displayed at Defendant's

12 Joybird retail showrooms.

13      46.    Consequently, Plaintiff is susceptible to reoccurring harm because he

14 cannot be certain that Defendant has corrected its deceptive pricing scheme, and he

15 desires to continue to purchase Joybird furniture in the future, assuming that he can

16 determine whether he is purchasing products at a true bargain. However, he currently

17 cannot trust that Defendants will label and/or advertise the merchandise truthfully

18 and in a non-misleading fashion in compliance with applicable law. Plaintiff simply

19 does not have the resources to ensure that Defendant is complying with California

20 and federal law with respect to its pricing, labeling, and/or advertising of its furniture

21 and related products. An injunction is the only form of relief which will guarantee

22 Plaintiff and other consumers the appropriate assurances.

23      47.    Further, because of the wide selection of furniture available at

24 joybird.com and its retail showrooms, the sheer volume of products involved in

25 Defendant's deceit (i.e., virtually all of them), and the likelihood that Defendant may

26 still yet "manufacture, market, import, export, distribute and retail" additional

27 "upholstery furniture products under the … Joybird® tradename[,]" Plaintiff may

28 again, by mistake, purchase a falsely discounted product under the reasonable, but

false, impression that the advertised reference price represented a *bona fide* former price at which the item was previously offered for sale by Defendant. However, without substantial, time-consuming, and costly investigation, Plaintiff will have no way of knowing whether Defendants has deceived him again.

48.    Absent an equitable injunction enjoining Defendant from continuing in the unlawful course of conduct alleged herein, Plaintiff, members of the Class, and the public will be irreparably harmed and denied an effective and complete remedy because they face a real and tangible threat of future harm emanating from Defendant's ongoing and deceptive conduct that cannot be remedied with monetary damages. Accordingly, Plaintiff, members of the Class, and the general public lack an adequate remedy at law and an injunction is the only form of relief which will guarantee Plaintiff and other consumers the appropriate assurances.

49.    Moreover, Plaintiff lacks an adequate remedy at law with respect to his claim for equitable restitution because he has not yet retained an expert to determine whether an award of damages can or will adequately remedy his monetary losses caused by Defendant. Moreover, to the extent Plaintiff has suffered damages as measured by the difference between the price paid and the value represented, California law prohibits him from recovering that measure of damages, but it does not prohibit him from recovering that measure as equitable relief. Cal. Civ. Code § 3343. Particularly, as legal damages focus on remedying the loss to the Plaintiff, and equitable restitution focuses wholly distinctly on restoring monies wrongly acquired by the defendant, legal damages are inadequate to remedy Plaintiff's losses because Plaintiff does not know at this juncture, and is certainly not required to set forth evidence, whether a model for legal damages (as opposed to equitable restitution) will be viable or will adequately compensate Plaintiff's losses.[32]

---

[32] Similar allegations have been upheld in other false discount cases where the defendant has likewise challenged the plaintiffs' ability to seek equitable relief following the decision in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). *See, e.g., Dahlin*, 2020 WL 6647733, at *4-5; *Adams*, 2021 WL 4907248,

1

**Defendant**

2      50.    Plaintiff is informed and believes, and upon such information and belief

3  alleges, Defendant is a Michigan corporation with its principal executive offices in

4  Monroe, Michigan. Plaintiff is informed and believes that Defendant owns and

5  operates joybird.com and Joybird retail showrooms in California, and advertises,

6  markets, distributes, and/or sells furniture and home décor products in California and

7  throughout the United States. Defendant's most recent (2023) Form 10-K provides

8  that "[w]e sell our products … directly to consumers through retail stores that we

9  ***own and operate***; and through ***our*** websites, www.la-z-boy.com and

10 ***www.joybird.com***." La-Z-Boy Inc., Annual Report (Form 10-K), at 4, 22 (Jun. 20,

11 2023) (emphasis added).

12     51.    Plaintiff does not know the true names or capacities of the persons or

13 entities sued herein as Does 1-50, inclusive, and therefore sue such defendants by

14 such fictitious names. Plaintiff is informed and believes, and upon such information

15 and belief alleges, that each of the Doe defendants is, in some manner, legally

16 responsible for the damages suffered by Plaintiff and members of the proposed Class

17 as alleged herein. Plaintiff will amend this Complaint to set forth the true names and

18 capacities of these defendants when they have been ascertained, along with

19 appropriate charging allegations, as may be necessary.

20     52.    Defendant knows that its reference price advertising is false, deceptive,

21 misleading, unconscionable, and unlawful under California and federal law.

22     53.    Defendant fraudulently concealed from and intentionally failed to

23 disclose to Plaintiff and other members of the proposed Class the truth about its

24 advertised discount prices and former reference prices. Defendant concealed from

25

26

27 at *3-4 (C.D. Cal. Mar. 1, 2021); *Fallenstein*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint). *Dahlin v. The Donna Karan Co. Store, LLC*, No. 2:21-cv-07711-AB-JPRx (C.D. Cal. Mar. 16, 2022) at ECF No. 30 (Order Denying Motion to Dismiss Plaintiff's First Amended Complaint) at 5-10

28

consumers the true nature and quality of the products sold on joybird.com and through its Joybird retail showrooms.

54.     Defendant intentionally concealed and failed to disclose material facts regarding the truth about false former price advertising in order to provoke Plaintiff and the proposed Class to purchase Joybird products.

55.     At all relevant times, Defendant has been under a duty to Plaintiff and the Class to disclose the truth about its false discounts.

## VIII.  CLASS ALLEGATIONS

56.     Plaintiff brings this action on behalf of himself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendant:

> All persons who, within the State of California and within the applicable statute of limitations preceding the filing of this action (the "Class Period"), purchased from joybird.com, or any website redirecting to joybird.com, or any Joybird retail store one or more products that were discounted from an advertised reference price and who have not received a refund or credit for their purchase(s).

Excluded from the Class is Defendant, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of its respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiff reserves the right to expand, limit, modify, or amend this Class definition, including the addition of one or more classes, in connection with their motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

57.     ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes that the proposed Class contains hundreds of thousands of individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff.

58.     ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

a.     whether, during the Class Period, Defendant used falsely advertised reference prices on their Joybird products at joybird.com and through Joybird retail showrooms stores ;

b.     whether Defendant ever offered items for sale or sold items at their advertised reference price;

c.     whether, during the Class Period, the original price advertised by Defendant was the prevailing market price for the products in question during the three months preceding the dissemination and/or publication of the advertised former prices;

d.     whether Defendant's purported sale prices advertised on joybird.com and through Joybird retail showroom stores reflected any actual discounts or savings;

e.     whether Defendant's purported percentage-off discounts advertised on joybird.com and in Joybird retail stores reflected any actual discounts or savings;

f.     whether Defendant's alleged conduct constitutes violations of the laws asserted;

g.     whether Defendant's alleged conduct constitutes violations of federal and California pricing regulations;

h.     whether Defendant engaged in an unconscionable commercial practice, and/or employed deception or misrepresentation under the laws asserted;

i.     whether Plaintiff and Class members are entitled to damages and the proper measure of that loss; and

j.      whether an injunction is necessary to prevent Defendant from continuing to use false, misleading or illegal price comparison.

59.    ***Typicality***: Plaintiff's claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived) by Defendant's false and deceptive price advertising scheme, as alleged herein. Plaintiff is advancing the same claims and legal theories on behalf of himself and all Class members.

60.    ***Adequacy***: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interests to those of the Class.

61.    ***Superiority***: The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to them and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendant will be permitted to retain the proceeds of its fraudulent and deceptive misdeeds.

62.    All Class members, including Plaintiff, were exposed to one or more of Defendant's misrepresentations or omissions of material fact claiming that former reference prices advertised prices were legitimate. Due to the scope and extent of Defendant's consistent false sale prices, advertising scheme, disseminated in a years-long campaign to California consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all

members of the Class. In addition, it can be reasonably presumed that all Class members, including Plaintiff, affirmatively acted in response to the representations contained in Defendant's false advertising scheme when purchasing merchandise sold at joybird.com and through Joybird retail showroom stores.

63. Plaintiff is informed that Defendant keeps extensive computerized records of its joybird.com and Joybird retail store customers through, *inter alia*, customer loyalty programs, credit card programs, and general marketing programs. Defendant has one or more databases through which a significant majority of Class members may be identified and ascertained, and it maintains contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

## IX.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of California's Unfair Competition Law ("UCL")
CAL. BUS. & PROF. CODE §§ 17200, *et seq.*

64. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

65. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

66. The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

67. The UCL imposes strict liability. Plaintiff and members of the proposed Class need not prove that Defendant intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

*"Unfair" Prong*

68.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

69.    Defendant's actions constitute "unfair" business practices because, as alleged above, Defendant engaged in misleading and deceptive price comparison advertising that represented false reference prices and corresponding deeply discounted phantom "sale" prices. Defendant's acts and practices offended an established public policy of transparency in pricing, including regulations enacted by the FTC, and they constituted immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

70.    The harm emanating from this practice to Plaintiff and members of the proposed Class outweighs any utility it provides because Defendant's practice of advertising false discounts provides no utility. There were reasonably available alternatives to further Defendant's legitimate business interests other than the misleading and deceptive conduct described herein.

*"Fraudulent" Prong*

71.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

72.    Defendant's acts and practices alleged above constitute fraudulent business acts or practices as Defendant has deceived Plaintiff and members of the proposed Class and is highly likely to deceive members of the consuming public. Plaintiff and members of the proposed Class relied on Defendant's fraudulent and deceptive representations regarding their false or outdated "original prices" for products sold by Defendant at joybird.com and through Joybird retail showroom stores. These misrepresentations played a substantial role in Plaintiff's and members

of the proposed Class's decision to purchase the product at a purportedly steep discount, and Plaintiff and members of the proposed Class would not have purchased the product without Defendant's misrepresentations.

**"Unlawful" Prong**

73.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

74.   Defendant's acts and practices alleged above constitute unlawful business acts or practices as Defendant has violated state and federal law in connection with their deceptive pricing scheme. The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements. 15 U.S.C. § 52(a). Under the FTC, false former pricing schemes, like Defendant', are described as deceptive practices that would violate the FTCA:

> (a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - *for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the "bargain" being advertised is a false one*; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price

> (b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $_____"), unless substantial sales at that price were actually made.

16 C.F.R. § 233.1(a) and (b) (emphasis added).

75.     In addition, Defendant's acts and practices violate California law, which expressly prohibits false former pricing schemes. The FAL, Cal. Bus. & Prof. Code § 17501, entitled "*Worth or value; statements as to former price*," states:

> For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.
>
> ***No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement*** or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

Cal. Bus. & Prof. Code § 17501 (emphasis added).

76.     Defendant violates § 17501 because it advertises items, including the items that Plaintiff purchased as described herein, with false former "original" reference prices that greatly exceed the prevailing market price of those items. Defendant's own sales records will show that it normally sells its products, including the item(s) purchased by Plaintiff, at prices lower than the advertised former "original" price, thereby establishing that those prices exceed the prevailing market price of Defendant's merchandise in violation of Cal. Bus. & Prof. Code § 17501.

77.     As detailed in the Third Cause of Action below, the CLRA, Cal. Civ. Code § 1770(a)(9), prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," and subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

78.     As detailed herein, and for the same reason that Defendant's acts and practices violate the FTCA and the FAL, they also violate the CLRA.

79.     Defendant's practices, as set forth above, misled Plaintiff, the proposed Class, and the public in the past and will continue to mislead them in the future.

Consequently, Defendant's practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

80.    Defendant's violations of the UCL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat to Plaintiff, members of the proposed Class, and the public who, if Defendant's false pricing scheme is permitted to continue, will be deceived into purchasing products based on illegal price comparisons. These false comparisons created phantom markdowns and lead to financial harm for consumers like Plaintiff and the members of the proposed Class as described herein. Because of the surreptitious nature of Defendant's deception, these injuries cannot be reasonably avoided and will continue to be suffered by the consuming public absent a mandated change in Defendant's practice.

81.    Pursuant to Bus. & Prof. Code § 17203, Plaintiff and members of the proposed Class are entitled to preliminary and permanent injunctive relief enjoining Defendant from continuing to engage in this unfair competition alleged above, as well as disgorgement and restitution to Plaintiff and the proposed Class of all Defendant's revenues wrongfully obtained from them as a result of Defendant's unfair competition, or such portion of those revenues as the Court may find equitable.[33]

---

[33] California permits broad discretion to fashion remedies as needed, and "the appropriate measure of recovery [under the equitable provisions of California's consumer protection laws] depends on the nature of the case and the alleged harm that [a plaintiff] suffers." *Le*, 160 F. Supp. 3d at 1104. "California's consumer protection laws…authorize multiple forms of restitutionary recovery." *Id.* at 1105; *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) ("[I]n calculating restitution under the UCL and FAL, the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information."); *Jacobo*, 2016 WL 3482041, at *7 ("Remedy for the alleged misconduct is not limited to the difference between the value of the goods [p]laintiffs purchased and the price for those goods."); *Russell v. Kohl's Dep't Stores, Inc.*, No. ED CV 15-1143 RGK (SPx), 2015 WL 12781206, at *3-4 (C.D. Cal. Oct. 6, 2015) (explaining why cost minus value is not the exclusive method of measuring restitution); *Spann v. J.C. Penney Corp.*, No. SA CV 12-0215 FMO (RNBx), 2015 WL 1526559, at *4 (C.D. Cal. Mar. 23, 2015) ("[A]lthough California case law makes clear that [cost minus value]

---

35

## SECOND CAUSE OF ACTION

**Violation of California's False Advertising Law ("FAL")**
**CAL. BUS. & PROF. CODE §§ 17500, *et seq.***

82.    Plaintiff  repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

83.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant for violations of California's FAL, Cal. Bus. & Prof. Code §§ 17500, *et seq*.

84.    Cal. Bus. & Prof. Code § 17500 provides:

> It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of . . . personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that . . . personal property or those services . . . which is ***untrue or misleading***, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . .

(emphasis added).

85.    The "intent" required by section 17500 is the intent to make or disseminate personal property (or cause such personal property to be made or disseminated), and not the intent to mislead the public in the making or dissemination of such property.

---

can be a measure of restitution, defendant has not cited, nor has the court found, any authority indicating that is the only way restitution can be calculated."); *Johns v. Bayer Corp.*, No. 09-cv-1935-AJB (DHB), 2012 WL 1520030, at *5 (S.D. Cal. Apr. 30, 2012) (finding that neither In re Vioxx nor any other case cited by the defendant "suggest[ed] that the difference in price paid and value received is the only proper measure of restitution"); *Stathakos*, 2016 WL 1730001, at *4 (challenge to restitution methodology premature at motion to dismiss stage); *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 792 (2015) (explaining that *In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009) did not limit measuring restitution to the price/value differential).

86.    Similarly, this section provides, "no price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price … within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement." Cal Bus. & Prof. Code § 17501.

87.    Defendant's routine of advertising discounted prices from false "reference" prices, which were never the prevailing market prices of those products and were materially greater than the true prevailing prices (i.e., Defendant's average and/or most common actual sale price), constitutes an unfair, untrue, and misleading practice in violation of the FAL. This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold at joybird.com and Joybird retail stores were worth more than they actually were.

88.    As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made during the course of Defendant's business, Plaintiff and members of the proposed Class suffered economic injury.

89.    Plaintiff and members of the proposed Class request that this Court order Defendant to restore this money to Plaintiff and the proposed Class, and to enjoin Defendant from continuing these unfair practices in violation of the FAL in the future. Otherwise, Plaintiff, members of the proposed Class, and the broader general public will be irreparably harmed and/or denied an effective and complete remedy.

## **THIRD CAUSE OF ACTION**

**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**CAL. CIV. CODE § 1750, *et seq.***

90.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

91.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the CLRA, Cal. Civ. Code § 1750, *et seq.*

92.     Plaintiff and each member of the proposed Class are "consumers" as defined by Cal. Civ. Code § 1761(d). Defendant's sale of products at joybird.com and through its Joybird retail showrooms were "transactions" within the meaning of Cal. Civ. Code § 1761(e). The products purchased by Plaintiff and members of the proposed Class are "goods" or "services" within the meaning of Cal. Civ. Code § 1761(a)-(b).

93.     Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiff and members of the proposed Class which were intended to result in, and did result in, the sale of products sold at joybird.com and through Defendant's Joybird retail showrooms:

a.     advertising goods or services with intent not to sell them as advertised; § 1770(a)(9); and

b.     making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions; § 1770(a)(13).

94.     Plaintiff is a consumer who has suffered economic injury and damages, including benefit of the bargain damages, as a result of Defendant's use and employment of the false and misleading reference pricing alleged herein. Pursuant to Cal. Civ. Code § 1780(a), Plaintiff therefore seeks an order enjoining such methods, acts, or practices as well as any other relief the Court deems proper.

Plaintiff additionally seeks costs and reasonable attorney's fees pursuant to Cal. Civ. Code § 1780(e).

95.    On May 29, 2024, Plaintiff, through counsel, sent a CLRA demand letter by certified mail to Defendant that provided notice of Defendant's violation of the CLRA and demanded Defendant correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein. The letter also stated that if Defendant refused to do so, Plaintiff would file a complaint seeking damages in accordance with the CLRA. If Defendant does not respond to Plaintiff's letter or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782, Plaintiff will amend the complaint to seek actual, punitive, and statutory damages, as appropriate against Defendant.

96.    Filed concurrently is a declaration of venue pursuant to Cal. Civ. Code §1780(d).

## X.    PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of himself and on behalf of the other members of the Class, requests that this Court award relief against Defendant as follows:

a.    an order certifying the Class and designating Plaintiff as the Class Representative and his counsel as Class Counsel;

b.    awarding Plaintiff and the proposed Class members all applicable damages;

c.    awarding restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of its unlawful, unfair, and fraudulent business practices described herein;

d.    awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court

supervision, victims of its misconduct and pay them all money they are required to pay;

e.      ordering payment of damages as permitted by law, including actual, compensatory, benefit of the bargain, and statutory damages, to the full extent permitted by law;

f.      retaining jurisdiction to monitor Defendant's compliance with permanent injunctive relief;

g.      ordering Defendant to engage in a corrective advertising campaign;

h.      awarding attorneys' fees and costs; and

i.      for such other and further relief as the Court may deem necessary or appropriate.

## XI.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

Dated: May 29, 2024

**LYNCH CARPENTER LLP**

By:  */s/ Todd D. Carpenter*
Todd D. Carpenter (CA 234464)
todd@lcllp.com
Scott G. Braden (CA 305051)
scott@lcllp.com
James B. Drimmer (CA 196890)
jim@lcllp.com
1234 Camino Del Mar
Del Mar, California 92014
Telephone:  619.762.1910
Facsimile:   (858) 313-1850

*Attorneys for Plaintiff and*
*Proposed Class Counsel*